# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 2:16-cr-00045-1 |
| | ) | |
| LAJWAN B. MCMILLAN, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

Pending before this Court is Defendant's Motion to Suppress Evidence, ECF No. 21. For the reasons that follow, Defendant's Motion is denied in part and granted in part.

## I. BACKGROUND

On March 8, 2016, the Defendant was charged with possession of a firearm and/or ammunition by a convicted felon, possession with intent to distribute a quantity of heroin, and possession of a firearm in furtherance of a drug trafficking crime. The events leading up to Defendant's indictment are as follows.

Early in the morning on Saturday, November 14, 2015, two police officers were patrolling part of Homewood, a neighborhood in Pittsburgh, and used their flashlights to look into a parked car. One officer noticed that the "slide and muzzle of a large-caliber black and silver pistol was protruding from underneath the front driver's seat." ECF No. 24 at 2; *see also* ECF No. 30 at 18:12-18:16. The officer then alerted his partner, who used his flashlight from the front of the car near the passenger side to see the firearm. ECF No. 30 at 18:4-18:22. A short while later, a third officer saw Defendant sitting in the driver's seat of the car. At approximately 3:11 a.m., the car drove away, and at approximately 3:12 a.m., several police officers stopped the

car and approached it, some with their weapons out of their holsters.[1] *Id.*; ECF No. 32 at 6; ECF No. 30 at 77:15-78:4, 98:1-98:14. Some of the subsequent events are disputed. Defendant asserts that he was never told he was going to be detained in handcuffs, ECF No. 32 at 4, and the Court notes that no such warning can be heard in the United States' Exhibit 1, the video from the dashboard camera in one of the police cars ("the Video"). *See* U.S. Ex. 1. However, one of the officers testified at the Court's Hearing held on August 30, 2016 that he heard another officer order Defendant to get out of the car and inform Defendant that he would be detained in handcuffs. ECF No. 30 at 40:5-40:13. In any case, what is plain is that Defendant was promptly handcuffed and that an officer frisked him but did not find anything of note. ECF No. 24 at 2-3. What is also plain from the Video is that Defendant was pushed by one officer twice, once when he was being handcuffed and once after. U.S. Ex. 1 at 3:12:40-3:13:04. At the Hearing, the officer testified that he "pushed [Defendant] slightly" because "[Defendant] bladed his body and turned like he was getting back into the vehicle." ECF No. 30 at 86:24-86:25.

Although no weapons were found during the frisk of Defendant, another officer went into the driver's side of the Defendant's car and found the gun; it had been pushed further under the driver's seat. ECF No. 24 at 3; ECF No. 32 at 2. That officer then asked Defendant if he had a permit to conceal carry a firearm, and Defendant said that he did not. ECF No. 24 at 3. The officers verified Defendant's lack of a permit using law enforcement computer databases, *id.*, and told Defendant that he was under arrest. U.S. Ex. 1 at 10:20-10:50. The computer databases also informed the officers that that the firearm was registered to someone else and had been reported stolen. ECF No. 24 at 3. The officers then proceeded to search Defendant's person and

---

[1] Before exiting the vehicle, Defendant provided the officers with a rental agreement for the car. ECF No. 21 at 2; ECF No. 24 at 2.

2

the car. They found 24 stamp bags of heroin in the car's center console and $2,899 in Defendant's pockets. *Id.*

## II. DISCUSSION

In this case, Defendant is seeking to suppress all the physical evidence found during his encounter with the police, as well as his statement to them about not having a gun license. ECF No. 21 at 3-4. It is well-established that "evidence seized during an unlawful search [can]not constitute proof against the victim of the search," and that "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963) (citing *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961)). Furthermore, "the prosecution may not use statements" made in violation of *Miranda. Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, to appropriately evaluate Defendant's Motion and determine if any evidence should be excluded, the Court will conduct a step-by-step analysis of the officers' actions.

### A. Was the Officers' Stop of the Car Lawful?

Yes. In *Terry v. Ohio,* the Supreme Court held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The question for the Court thus becomes whether or not the officers in this case had a reasonable suspicion that "criminal activity [was] afoot." The Court concludes that they did.

"[P]ossession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the

3

individual and briefly detain him in order to investigate whether the person is properly licensed." *Com. v. Robinson*, 410 Pa.Super. 614, 620, 600 A.2d 957, 959 (1991), *appeal denied*, 617 A.2d 1273 (Pa. 1992). This holding has been extended to allow the police to stop cars in situations in which a firearm is "originally observed in an unoccupied car [...] regardless of whether a violation of the Motor Vehicle Code was observed." *Com. v. Mason*, 2015 Pa.Super. 268, 130 A.3d 148, 153 (2015), *appeal denied,* 138 A.3d 3 (Pa. 2016); *see United States v. Lewis*, 672 F.3d 232, 239 (3d Cir. 2012) (recognizing the "paramount importance" of considering the treatment of firearms under local law).[2] Because the police officers in this case had seen a firearm in plain view in Defendant's car, the officers' initial stop of the car was lawful.

### B. Could the Officers Lawfully Ask Defendant to Leave the Car and Then Handcuff Him?

Yes. The officer's instruction to Defendant to leave the car was lawful, *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977), as was the officer's decision to restrain Defendant in handcuffs. In his papers, Defendant argues that the officers' actions, including that at least some of the officers had their guns drawn and that one officer handcuffed him and pushed him twice, constituted a *de facto* arrest at that moment. Although the Court acknowledges that "it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause," the Court concludes that these events did not constitute a *de facto* arrest, at least not early on. *United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010). The Third Circuit has "recognized that

---

[2] In *Mason*, the Superior Court relied on its prior holding in *Robinson* in these regards. Each of those cases arose from events in the City of Pittsburgh, in Allegheny County, considered the application of license requirements for concealed firearms under 18 Pa.C.S. §§ 6101 and 6106, and upheld the authority of police officers to make *Terry* stops based on their awareness of the presence of a gun. Neither case had to consider the rather unique provisions of Pennsylvania statutory law relative to concealed firearms applicable to the City of Philadelphia. *See United States v. Cooper*, 293 F. App'x 117, 119 (3d Cir. 2000); *Commonwealth v. Bigelow*, 399 A.2d 392, 396 (Pa. 1979). In light of the directive from our Court of Appeals that "paramount" consideration be given to the treatment of firearms under local law, and the recent and authoritative nature of the Superior Court's holding in *Mason*, the Court concludes that the rule that *Mason* reaffirmed generated the requisite "reasonable suspicion" for the stop of the car here.

'the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se.' *United States v. Edwards,* 53 F.3d 616, 619 (3d Cir.1995) (collecting cases). Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *Id.* at 448 (citations omitted).

The fact that a police officer pushed the Defendant against the driver's side of the car twice when he first exited the car does not change the Court's conclusion. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (U.S. 1989), and "when police officers make an investigative stop, they may take such steps as are [']reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.[']" *Edwards*, 53 F.3d at 619 (quoting *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985)). In order to evaluate the reasonableness of the officer's use of force in this case, the Court must "judge from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 443.

In this case, the police strongly believed that there was a firearm in Defendant's car (for good reason) and Officer Patton (the officer who pushed Defendant) testified that he witnessed Defendant "blad[ing] his body and turn[ing] like he was getting back into the vehicle." ECF No. 30 at 86:24-86:25. After reviewing the Video, the Court concludes that Defendant did turn his body in such a way that it was reasonable for the police officers, in the moment and under the circumstances, to believe that Defendant was planning to try to get back into the car, where the officers had reason to believe a firearm was still located. In reality, a fair assessment of the

5

Video is that as Defendant was out of the car, directly adjacent to the open driver's door, he was moving back toward the driver's side of the passenger compartment. Accordingly, any pushing of Defendant by the officer did not elevate the *Terry* stop into a *de facto* arrest because the officer's "actions were consistent with the actions of a reasonably prudent person under the belief that their own safety and the safety of others was at risk." *United States v. Fields*, 449 F. App'x 146, 148 (3d Cir. 2011) (holding that the use of a taser when officers believed defendant was reaching for a gun did not elevate an investigatory stop into a *de facto* arrest).[3]

### C. Were the Officers' Frisking of Defendant and Retrieval of the Firearm from the Car Lawful?

Yes. It is well-established that the law permits "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. In this case, although the police officers were not "absolutely certain" that Defendant had a firearm on his person when he exited the car, they lawfully frisked Defendant because they reasonably believed that Defendant was "an armed and dangerous individual"—they knew that a firearm had been very recently seen in Defendant's car and could have easily been picked up by Defendant and concealed on his person.

Additionally, the subsequent retrieval of the firearm from the car was lawful. As the Supreme Court has explained, "the search of the passenger compartment of an automobile,

---

[3] Defendant makes much of the fact that there were multiple officers on the scene and that the officers allegedly did not inform him that he was going to be detained in handcuffs. ECF No. 32 at 6-11. However, Defendant does not cite to any Third Circuit law that ties the relevance of such facts to the Court's analysis here. Additionally, the Court notes that leading Third Circuit opinions do not mention the number of officers present or whether the defendant was told he would be detained in handcuffs when explaining their decisions as to whether the events in question constituted a *Terry* stop or a *de facto* arrest. *See, e.g., Johnson*, 592 F.3d at 447-48.

limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on [']specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant['] the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S. Ct. 3469, 3481, 77 L. Ed. 2d 1201 (1983) (quoting *Terry*, 392 U.S. at 21).

Here, the officers had first-hand knowledge that there was a firearm in Defendant's car. Also, the Video demonstrates that the search for the gun occurred before Defendant was settled at the back of the car—the officers were still struggling to gain full control of Defendant and Defendant was seemingly attempting to move toward the passenger compartment of the car when an officer knelt down, bent over into the driver's side of the passenger area and retrieved the gun from under the seat where Defendant had been sitting. Furthermore, at that moment, the officers were unaware that Defendant did not have a gun permit and therefore did not know that they would be arresting him and permanently prohibiting him from return to his car. Accounting for these circumstances, the retrieval of the firearm was lawful because the officer who searched for the weapon in the car reasonably believed that Defendant was "dangerous" and could "gain immediate control of weapons," either at that moment or when he was allowed to get back into his car. *Id.* at 1049-52 (explaining that it was reasonable for officers to search a car for weapons even when defendant was "effectively under [the officers'] control" but a "full custodial arrest ha[d] not been effected," in part because defendant would have been allowed back into his car if he wasn't arrested).

Given that the Court concludes that the officers did not violate the Fourth Amendment during the events leading up to and including the retrieval of the firearm, the firearm will not be suppressed.

### D. Did the Officers Violate Miranda By Asking Defendant If He Had A Gun Permit?

Yes, and Defendant's statement will be suppressed; however, the *fact* that Defendant did not have a license for his gun will not be suppressed. In this case, the officers failed to give Defendant his *Miranda* warnings before asking him if he had a gun permit.[4] Although Defendant had not been formally "arrested" (by affirmative police declaration) at the time he was asked about a permit, this does not end the Court's inquiry because *Miranda* applies to all "custodial interrogations [...] unless [the United States] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. "To determine whether an individual is in custody when he has not been arrested, we inquire whether there is a [']restraint on freedom of movement of the degree associated with a formal arrest.[']" *United States v. McNeil*, 416 F. App'x 227, 228 (3d Cir. 2011) (citations omitted). The Third Circuit has identified five factors that must be considered to make the determination:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359–360 (3d Cir.2006).

---

[4] The Court recognizes that 18 Pa.C.S. § 6122 states that "[w]hen carrying a firearm concealed on or about one's person or in a vehicle, an individual licensed to carry a firearm shall, upon *lawful demand* of a law enforcement officer, produce the license for inspection." 18 Pa.C.S. § 6122 (emphasis added). However, "lawful demand" is not defined in the statute, and neither party has pointed to any cases, either federal or state, that define "lawful demand" and explain its interaction with *Miranda*, nor has the Court been able to locate any. Accordingly, in this case, the Court will apply the long-standing Supreme Court precedent associated with custodial interrogations without regard to any gloss that could be applied by that statute.

In this case, the Court must consider that: (1) the officers did not tell Defendant that he was under arrest or that he was free to leave before questioning him (2) the questioning occurred on a public street, (3) the questioning lasted for a very brief period of time (one question), and (4) the officers had displayed their weapons when they approached the car and then proceeded to handcuff Defendant. Even though these facts weigh on opposite sides of the same scale, in balancing them, especially the fact that Defendant was handcuffed, surrounded by a dozen (literally) police officers, and restrained at the back of his car when he was "questioned," Defendant was in custody (whether under "arrest" or not) when he was asked if he had a gun permit.[5] *See, e.g., United States v. Crews*, No. CR 06-418, 2009 WL 426646, at *7 (W.D. Pa. Feb. 20, 2009), *aff'd*, 494 F. App'x 240 (3d Cir. 2012); *United States v. Wolford*, No. CR. 08-29, 2010 WL 4363871, at *10 (W.D. Pa. Oct. 27, 2010); *cf. United States v. Morgan*, 562 F. App'x 123, 130 (3d Cir.), *cert. denied*, 135 S. Ct. 153, 190 L. Ed. 2d 112 (2014). Defendant was in custody whether any magic "arrest words" were used. Because the questioning constituted a custodial interrogation, Defendant's statement should be suppressed. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682 (1980) (explaining that "interrogation" under Miranda refers [] to express questioning").

However, in this case, the *fact* that Defendant did not have a permit will not be suppressed because the "independent source" doctrine applies. As explained by the Supreme Court, "[t]he independent source doctrine allows admission of evidence that has been discovered

---

[5] The Court recognizes that questioning conducted during a roadside traffic stop is generally not considered a "custodial interrogation." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d. 317 (1984). In *Berkemer*, the Supreme Court explained that because traffic stops are typically brief, conducted in public, and only involve one or two police officers, "persons temporarily detained pursuant such stops are not 'in custody' for the purposes of Miranda." *Id.* at 437-440. However, the Supreme Court clarified that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *Id.* at 440. For the reasons discussed, the Court believes that this is one such case and that Defendant was "in custody" for *Miranda* purposes when the officers asked him if he had a permit for his firearm.

by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 2508, 81 L. Ed. 2d 377 (1984); *see also Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). For example, "officers who unlawfully enter an area protected by the Fourth Amendment and learn of facts $x$ and $y$ but then later learn of facts $x$ and $y$ independently and lawfully, can have admitted into evidence their knowledge concerning facts $x$ and $y$." *United States v. Herrold*, 962 F.2d 1131, 1140 (3d Cir. 1992). In this case, the United States can have the fact that Defendant lacked a gun permit admitted into evidence because, as Defendant admits in his papers, they also learned of the information from an independent source—the gun permit databases. ECF No. 32 at 20-21.

In *United States v. Price*, a case involving a warrantless search and a subsequently-obtained warrant, the Third Circuit, following the precedent set forth in *Herrold*, began its independent source analysis by questioning "whether the police would have applied for a warrant without the material tainted by a warrantless search." *United States v. Price*, 558 F.3d 270, 282 (3d Cir. 2009). In accordance with this reasoning, to determine if the independent source doctrine is applicable to the case at bar, the Court must ask whether the officers would have checked their databases to see if Defendant had a permit had he not affirmatively stated that he did not. The Court concludes that "it seems impossible that the police would not have" checked the databases had they not spoken to Defendant. *Id.* Given that the officers actually did cross-check Defendant's gun license status with their databases *even after* Defendant admitted that he did not have a permit, the officers would certainly have consulted their databases had Defendant stated he had a permit, or had he not said anything. Accordingly, the Court holds that the *fact* that Defendant did not have a permit for the firearm should not be suppressed, but his statement to that effect will be.

### E. Should the Heroin Found in Defendant's Car Be Suppressed?

No. Preliminarily, the Court notes that Defendant's arrest was lawful even though the officers did not have an arrest warrant. "Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony." *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002) (citations omitted). Given that having a gun in a car without a gun license is a felony in Pennsylvania, 18 Pa.C.S. § 6122(a)(1), in this case, the officers had the requisite probable cause to believe that Defendant had committed a felony. The officers saw the gun in Defendant's car and did not formally arrest Defendant until after they learned that he did not have a permit for his gun. Additionally, the arrest occurred in public on a public street.

Because the officers discovered the heroin in a search of the car that occurred after the officers began validly arresting Defendant, the Court must first consider if the search was a proper search incident to arrest.[6] U.S. Ex. 1 at 3:21:15-3:22:00. In this case, the Court concludes that it was not.[7] In *United States v. Shakir*, the Third Circuit examined the Supreme Court's most recent precedent on car searches incident to arrest, *Arizona v. Gant*, 556 U.S. 332 (2009). The Third Circuit explained:

> [I]f *Gant* is construed to forbid all container searches after a suspect is handcuffed or held by police, it would not only narrow *Belton* but also effectively eliminate a major element of the search-incident-to-arrest doctrine […] [W]e hold that a

---

[6] The Court notes that contrary to Defendant's assertions, ECF No. 32 at 21-22, it is plain from the Video that the officers used the database to verify that Defendant did not have a gun permit *before* they formally arrested him and *before* the "wing span" search that generated the heroin. U.S. Ex. 1 at 10:15-12:45. In fact, Defendant is conflating the two searches of the car. ECF No. 32 at 21-22. The officers discovered the firearm in their first entry to the car, which was lawful because it occurred while Defendant was still standing near the passenger compartment of the car and was seemingly trying to return to the driver's seat. The heroin was discovered in the later, "wing span" search, which did not occur until after Defendant had been told that he was under arrest. *See* U.S. Ex. 1 at 10:15-12:45.

[7] The Court also notes that the "automobile exception" does not apply to the warrantless search of the car in this case because the officers did not have probable cause to "believe the vehicle contain[ed] contraband." *United States v. Boyd*, 625 F. App'x 183, 186 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 2012, 195 L. Ed. 2d 222 (2016).

11

> search is permissible incident to a suspect's arrest when, under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched. Although this standard requires something more than the mere theoretical possibility that a suspect might access a weapon or evidence, it remains a lenient standard.

*United States v. Shakir*, 616 F.3d 315, 320, 321 (3d Cir. 2010). Additionally, "in determining if an object is conceivably accessible to the arrestee, we are to assume that he was neither an acrobat nor a Houdini." *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (internal quotation marks and alteration omitted).

In *Shakir*, the defendant was handcuffed and watched over by two armed police officers when his bag, which was "literally at his feet," was searched incident to his arrest. *Shakir*, 616 F.3d at 319, 321. The Third Circuit held that the search was lawful, stating, "[a]lthough it would have been more difficult for [defendant] to open the bag and retrieve a weapon while handcuffed, we do not regard this possibility as remote enough to render unconstitutional the search incident to arrest." *Id.* at 321. In this case, unlike in *Shakir*, Defendant was very closely guarded by at least five armed police officers at the time the passenger compartment search began. U.S. Ex. 1 at 3:21:50. Furthermore, he was standing at the back of the car behind the trunk, at least a few feet away from the door to the car's passenger compartment, and there were a *half-dozen* other officers right behind the closer "bodyguard" officers. In short, Defendant was going nowhere. There was no "reasonable possibility" that Defendant could access the inside of the car at the time the search began.[8]

---

[8] Nor would this search be justified by a reasonable belief that the car contained "evidence of the offense." *Gant*, 556 U.S. at 344. Defendant had been arrested for having a concealed firearm without a permit. The police had already found and seized that gun. Thus, it does not appear that there was a basis to search the vehicle for "evidence relevant to the crime of arrest," since the police already had it. *Id.* at 343 (citations and internal quotations omitted).

The United States nonetheless contends that the heroin is still admissible because of the "inevitable discovery" doctrine. The inevitable discovery doctrine provides that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means [...] then the deterrence rationale has so little basis that the evidence should be received." *Nix*, 467 U.S. at 444. In this case, Defendant's car (a rental car) was to be towed, and was towed, from the scene, ECF No. 32-3, and the "Towing and Tow Pound Procedures: Inventories" of the Pittsburgh Bureau of Police indicate that "towing officer[s]" have a duty to inventory cars that are being towed. U.S. Ex. 2 at 1. Additionally, at the Hearing, one of the officers (Officer Obsenica) explicitly testified that an inventory search was conducted in this case pursuant to the relevant policy,[9] and there is no evidence in the record to contradict that testimony.[10] ECF No. 30 at 27:5-27:9, 88:18-21. The

---

[9] The Court notes that the search that actually turned up the heroin would not appear to have been an inventory search. Under Supreme Court and Third Circuit law, "warrantless searches of automobiles impounded or otherwise lawfully in police custody are reasonable under the Fourth Amendment when they are conducted [']pursuant to standard police procedures.[']" *United States v. Matthews*, 532 F. App'x 211, 218 (3d Cir. 2013) (citing *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)). In this case, the "Towing and Tow Pound Procedures: Inventories" indicate that "[e]xamination of the contents of a motor vehicle **pursuant to a criminal investigation** or with the intent of discovering evidence of a crime is a **search,** not an administrative inventory." U.S. Ex. 2 at 1 (emphasis in original); *see United States v. Mundy*, 621 F.3d 283, 287-294 (3d Cir. 2010) (explaining that inventory searches must be conducted in good faith and that "[t]he Fourth Amendment does not permit police officers to disguise warrantless, investigative searches as inventory searches"). Here, it would appear that this on-the-scene search was not an "inventory." To begin with, the officer who found the heroin described his search as a "wing span" search, ECF No. 30 at 79:3-79:5, and distinguished it from a later "inventory" of the car. *Id.* at 88:18-88:21. Additionally, the officer described the "wing span" search as "check[ing] the immediate area of the driver's seat and anywhere [Defendant] could reach," *Id.* at 114:7-114:8, and said that he believed he could have conducted the same search earlier, *Id.* at 116:7-116:9. (Maybe he could have under *Gant* at a point when Defendant could still have returned to the inside of the car). Nonetheless, the testimonial record demonstrates that there was a distinct, separate "inventory" search conducted pursuant to the "Towing and Tow Pound Procedures: Inventories." *Id.* at 88:18-88:21.

[10] Defendant argues that the "Tow Slip" does not indicate that any inventory results were found. ECF No. 32 at 24. The Court notes that Defendant does not fully explain this point and that there is in fact illegible writing in the "Articles in Vehicle/Notes" section of the "Tow Slip" that at least does not controvert the testimony that an inventory search was actually conducted. Defendant also contends that the only reason the car had to be towed was that Defendant was pulled over by the police in a no-parking area, Frankstown Avenue, rather than on Putnam Street, where Defendant was first seen in the car. That is true, but standing alone does not support an inference that the police pulled the car over when they did as a "set up" for a tow and inventory search. From viewing the Video, it would appear to the Court that the pull over on Frankstown Avenue put the stop in a better lit area, with greater accessibility by other police vehicles.

Court concludes that the United States has established by a preponderance of the evidence that the heroin would inevitably have been discovered via the inventory search conducted pursuant to, and consistent with, the "Towing and Tow Pound Procedures: Inventories." On this ground, the Court holds that the heroin should not be suppressed.

### III. CONCLUSION

Defendant's Motion to Suppress Evidence is denied in part and granted in part. None of the challenged physical evidence shall be suppressed, but Defendant's statement about not having a gun license will be.[11]

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: January 4, 2017

cc: All counsel of record

---

[11] Defendant also moved to dismiss the Indictment on the basis that the Court lacks jurisdiction, but candidly admits that such Motion is essentially filed on a "protective" basis, ECF No. 22, and it will be denied without prejudice. Defendant moved for the production by the United States of evidence it would seek to use pursuant to Fed. R. Evid. 404(b) and 609. The Court will deny the Motion without prejudice at this point, but will set a timeline for such disclosures in its Pretrial Order.